# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| HANAA B. ABADEER, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 3:09-cv-00125** |
| v. | ) | |
| | ) | **Judge Sharp** |
| TYSON FOODS, INC., et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court are cross-motions for partial summary judgment, (Docket Nos. 206 & 210), on Plaintiffs' Fair Labor Standards Act and state-law claims, which have been fully briefed by the parties, (Docket Nos. 206-1, 210-1, 222, 226, 233, 235). Also before the Court is Defendants' motion for reconsideration of a prior order denying Defendants' motion to dismiss Plaintiffs' claim under § 50-2-101(b) of the Tennessee Wage Regulation Act, (Docket No. 254), which is fully briefed as well, (Docket Nos. 255, 256, 259). For the reasons stated, the cross-motions for partial summary judgment will be GRANTED IN PART and DENIED IN PART, and the motion for reconsideration will be GRANTED.

## FACTUAL BACKGROUND

Plaintiffs are current and former hourly production employees (collectively "employees" or "workers") at a beef- and pork-processing plant in Goodlettsville, Tennessee that Defendants Tyson Foods, Inc. and Tyson Fresh Meats, Inc. (collectively "Tyson") began to operate when Tyson acquired IBP, Inc., the plant's original owner, in September 2001. (Docket No. 37 at 2; Docket No. 222-1 at 1; Docket No. 226-1 at 1). The employees work in a variety of positions, including Trimmer, Styler, Trainer, Inspector, Pump Operator, Machine Operator, and Bag

Opener.  (Docket No. 37 at 2).  Upon hiring, Tyson told the employees they would be paid an hourly wage for all of the hours they worked.  (Docket No. 226-1 at 3).

Goodlettsville employees are required to clock in at the beginning of their shifts using a time clock located on the production floor and to clock out using the same time clock at the end of their shifts. (*Id*. at 9–10).  Tyson uses the clock-in time for attendance purposes only, not to determine the hours an employee worked on a given shift.  (*Id*.)  Instead, Tyson measures compensable work time using an "Alternative Time and Attendance System," (Docket No. 222-1 at 1), which pays an employee based on a preset "Pay Start Time" that corresponds to his position on the production line,[1] (Docket No. 226-1 at 3–7).  While an employee is not paid in the main for work he does after clocking in but before his Pay Start Time, clock-in times are used to "flag" him if he clocks in after his Pay Start Time and may be used in that situation to dock his pay.[2]  (*Id*. at 9–10).  A worker is paid until he clocks out at the end of his shift.  (*Id*. at 8).

Tyson requires each employee to be at his work station and ready for the line to start moving by his Pay Start Time, or else be subject to discipline.  (*Id*. at 8–9).  "Ready" means dressed in sanitary and protective clothing and equipment necessary for the employee's position. (*Id*.).  Before January 2009, when Tyson changed its frock distribution policy, an employee had to do the following tasks after getting to the plant but before his Pay Start Time:

---

[1] This is true despite the fact that every employee in a given part of the production floor has the same scheduled shift time.  So, for example, all morning-shift employees on the Beef Slice floor go to work in the factory from 6:30 a.m. to 3:30 p.m.  (Docket No. 226-1 at 4).  Tyson does not inform the employees of their specific Pay Start Time in writing.  (*Id*. at 12.)

[2] Unless a supervisor overrides it, Tyson docks an employee who clocks in for a shift one or more minutes late $0.30 an hour for every hour of work during that workweek.  (*Id*. at 10–11).  Tyson characterizes this amount as "attendance incentive pay" which is otherwise available if the employee is punctual.  (*Id*.).

2

- retrieve and don a sanitary frock from an assigned locker on the second floor of the plant;

- retrieve and don a hair net, beard net (if needed), hard hat, and hearing protection from an assigned locker[3];

- retrieve from an assigned locker position-specific equipment, which might include a combination of safety glasses, gloves, a plastic arm sleeve, a forearm guard, a mesh glove, a belly guard, a rubber apron, a scabbard, steel, a hook, a hook holder, and a ruler;

- carry the retrieved equipment from the locker down two flights of stairs to the production hallway;

- wash his hands in a sink in the production hallway;

- walk through a sanitizing foot bath onto the production floor;

- sanitize all non-fabric items in a sanitation tank (if such items were retrieved);

- don all sanitized non-fabric items (again, only if such items were retrieved);

- collect and don one or two pairs of gloves;

- prepare for the beginning of production duties to the extent necessary, which may include bringing labels to the work station; wiping down his work station; setting up step stools; and collecting knives from the knife cart; and

- arrive at his work station by Pay Start Time.

---

[3] Unlike the frocks, employees are allowed to take these items home and are not required to store them at work. (*Id*. at 29).

3

(*Id*. at 22, 50–56).  The parties agree that Tyson does not compensate employees for the period of time that passes from when they don their frocks to their scheduled Pay Start Time.[4]  (*Id*. at 18–19).  They dispute, however, the amount of time these activities took before January 2009.  The employees say they took 12–15 minutes; Tyson counters that it was fewer than seven minutes.  (*Id*. at 56–57).

At the end of each shift, after the last piece of meat passes their work stations, employees may leave the production line and clock out using the time clock on the production floor.  (*Id*. at 57–58).  Prior to January 2009, employees had to remove and wash some of their equipment in sinks on the production floor, which some did before clocking out and others did afterwards.  (*Id*. at 58–60).  (Tyson had no written policy directing employees to wash their equipment before clocking out.  (*Id*. at 59–60).)  Then, after clocking out, employees had to sanitize their washed, non-fabric equipment in a dip tank and take it upstairs to the locker room.  (*Id*. at 61–62).  Tyson's policies prohibit employees from taking off their frocks, hard hats, beard nets, and hearing protection on the production floor, so employees doffed these items either on the way to or in the locker room—but always after clocking out.  (*Id*. at 61).  Once in the locker room, employees would exchange their dirty frocks for clean ones at a window at the far end of the room.  (*Id*. at 63).  They could leave the plant only after putting clean frocks and equipment in lockers, as Tyson required frocks to be stored in the plant between shifts and prohibited unsanitized equipment in lockers.  (*Id*. at 62, 64–66).  The parties agree that Tyson did not pay the employees for the activities they performed after clocking out on the production floor.  (*Id*. at

---

[4] An important exception is that Tyson pays all knife-users an additional four minutes a day pursuant to a company-wide permanent injunction issued in *Reich v. IBP, Inc.*, 1996 WL 137817 (D. Kan. Mar. 21, 1996), which requires Tyson, as IBP's successor, to comply with the FLSA's overtime and recordkeeping provisions.  *See Garcia v. Tyson Foods, Inc.*, 474 F. Supp. 2d 1240, 1242–43 (D. Kan. 2007) (discussing history of this litigation); *see also Jordan v. IBP, Inc.*, No. 3:02-cv-1132, 2004 U.S. Dist. LEXIS 30490, at *5–22 (M.D. Tenn. Oct. 13, 2004) (same).

59–62, 64, 66).  But, just as with the pre-shift activities, they disagree about how much time these post-shift activities took before January 2009.  The employees insist it was 12–15 minutes; Tyson says it could have been no more than five minutes.  (*Id*. at 66–67).

In January 2009, Tyson changed the frock-distribution policy in Goodlettsville that affected both pre-shift and post-shift activities.  (*Id*. at 22).  The new policy effectively eliminated the employees' need to don frocks and collect gear in the locker room, carry the gear downstairs, and sanitize the gear before putting it on.  Instead, employees could get their frocks before their Pay Start Time from a bin located in the production hallway outside the production floor.  (*Id*.).  After donning the frock, hair net, beard net (if needed), hard hat, and ear plugs, and washing their hands in the production hallway, employees would walk through the sanitizing foot bath onto the production floor, where they would collect and don the additional equipment required for their positions (without having to sanitize it).  (*Id*. at 68–69).  Other tasks employees had to do to prepare for the beginning of production duties were unchanged.  (*Id*. at 70–71).  The employees concede that the new frock-distribution policy shaved some time off their pre-shift activities, estimating these activities took 9–10 minutes to perform after January 2009.  (*Id*. at 71).

The greater impact of the January 2009 changes was on post-shift activities.  Since January 2009, Tyson has required Goodlettsville employees to return dirty frocks at the end of the shift to a bin on the production floor.[5]  (*Id*. at 22).  Because this occurs at the same time they clock out, the employees do not allege that they have performed uncompensated post-shift work since January 2009.  (Docket No. 206-1 at 10 n.6).

---

[5] Just as before, the employees can stow their hard hats, hair nets, beard nets, and ear protection in their lockers or leave the plant with those items.  (Docket No. 226-1 at 29–30, 68 n.14).

With regard to meal periods, Tyson's Alternative Time and Attendance System automatically docks 30 minutes of time for an unpaid meal period if an employee works more than six-and-one-half hours.  (Docket No. 226-1 at 73).  Because employees are not allowed to leave meat on the conveyor belt when they go on their meal break, and because it can take up to five minutes for a piece of meat to go from the front of the production line to the end of it, the employees leave for their meal breaks in a staggered fashion, depending on their place in the line.  (*Id*. at 73–74).

The parties dispute when the meal period begins and ends.  The employees say that although the 30-minute meal break technically starts at a set time every day, they continue working after the meal period begins because they cannot leave their workstation until the last piece of meat passes by.  (*Id*. at 73).  Tyson responds that the employees do not regularly perform production work during the meal break because the 30-minute period begins at a different time for each employee, commencing when an employee leaves the line.  (*Id*.).  (Curiously, Tyson has no documents that establish that each employee's meal period starts when that person leaves the production line and ends 30 minutes after that time.  (*Id*. at 87).)

Despite the disagreement as to whether employees do production work during the meal period, the parties agree on several points.  First point of agreement:  after employees leave the production line—and thus during their 30-minute meal period—they must doff their frocks and most other required equipment, wash the non-fabric equipment, and hang all of these items on hooks before leaving the production floor.  (*Id*. at 74–75).  Second point of agreement:  by the end of their 30-minute meal period, employees must wash their hands with soap and water, enter the production floor, don their frocks and other required equipment, and be in their place on the

6

production line.[6]  (*Id*. at 84–85).  Final point of agreement:  Tyson does not pay the employees for any of the doffing, washing, and donning activities that occur during the 30-minute meal period.  (*Id*. at 86–87).  As might be expected, though, how much time these activities take during the meal period is contested.  The employees estimate that it's 10–12 minutes; Tyson says it is fewer than four.  (*Id*. at 87, 89).

## LEGAL STANDARD

A party may obtain summary judgment if the evidence establishes that there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 914 (6th Cir. 2000).  The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met.  *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question is whether any genuine issue of material fact is in dispute.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported summary-judgment motion, the nonmoving party must set forth specific facts that show a genuine issue of material fact for trial.  If the party does not do so, summary judgment may be entered.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden to point to evidence demonstrating a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  *Celotex*, 477

---

[6] The employees also complain that Tyson's restroom-use policy cuts into their 30-minute meal period. Because plant workers must doff their frocks when they go to the restroom, Tyson expects them to use the restroom during their unpaid meal period to minimize disruption on the production floor.  (Docket No. 226-1 at 78–80).  While Tyson's express policy is that employees will not be denied access to the restroom during production time, employees are nonetheless subject to discipline if they abuse the restroom privilege.  (*Id*. at 79).

7

U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When ruling on cross motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

## ANALYSIS

This analysis proceeds in five parts. First, it addresses the issues related to the employees' summary-judgment motion with respect to their claims for pre- and post-shift activities. Second, it considers the parties' cross-motions for summary judgment with respect to the employees' meal-period claims. Third, the memorandum takes up the parties' cross-motions for summary judgment on the employees' claim that Tyson willfully violated the FLSA, as well as Tyson's good-faith defense to liquidated damages. Fourth, it evaluates both parties' summary-judgment motions on the employees' state-law breach-of-contract claim. Finally, it examines Tyson's motion to reconsider a previous order that declined to dismiss the employees' claims under § 50-2-101(b) of the Tennessee Wage Regulation Act, before considering the employees' summary-judgment motion on these same claims.

## I. Pre-shift and post-shift activities' claim

The employees ask the Court to enter summary judgment in their favor on their claim that Tyson is liable for failing to pay them from "frock to frock." In other words, they seek compensation for the actual time they spend on pre-shift donning and related preparatory duties (as well as attendant walking and waiting time) from the moment they don their frocks at the plant until their "Pay Start Time," as well as for the time at the end of the shifts after their pay ends but before they doff their frocks. (Docket No. 206 at 1–2). Though their estimates of the

8

amount of time these activities take vary, the parties agree that not all Tyson production employees were compensated for these activities.[7]  (Docket No. 226-1 at 18).  Tyson contends, however, that genuine disputes of material fact on a number of relevant issues—whom the donning and doffing of the frock primarily benefits, whether donning and doffing other protective gear is compensable, and how to measure the continuous workday—preclude summary judgment on this claim.

### A.  Preclusive effect of *Jordan v. IBP, Inc.*

Citing a summary-judgment order entered by Judge Trauger in *Jordan v. IBP, Inc.*, 542 F. Supp. 2d 790 (M.D. Tenn. 2008)—a case that challenged many of the same compensation practices at the same plant at issue here—the employees argue that the doctrine of issue preclusion prevents Tyson from relitigating the issue of whether donning and doffing the frock begins and ends the continuous workday at Goodlettsville.  Tyson responds that issue preclusion cannot apply because the order in question awarded partial summary judgment, rendering it an interlocutory order subject to revision, as well as one that did not result in a final judgment because the parties later settled the case.

"Issue preclusion bars relitigation of an issue when:  (1) the identical issue was raised and actually litigated in a prior proceeding; (2) the determination of the issue was necessary to the outcome of the prior proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom issue preclusion is sought had a full and fair opportunity

---

[7] While Tyson originally asserted that some or all of the employees' claims were barred by the de minimis doctrine, which allows an employer to disregard otherwise compensable work time when only a few seconds or minutes of work are in dispute, *see* 29 C.F.R. § 785.47, Tyson recently withdrew that affirmative defense to liability.  (Docket No. 260 at 1).

9

to litigate the issue in the prior proceeding." *Gen. Elect. Med. Sys. Europe v. Prometheus Health*, 394 F. App'x 280, 283 (6th Cir. 2010) (citation omitted).

In this case, the employees cannot satisfy the third factor. Under Federal Rule of Civil Procedure 54(b), an order that adjudicates less than all claims pending in an action only results in a "final judgment" with respect to the adjudicated claims if the court makes two determinations: "First, the district court must expressly direct the entry of final judgment as to one or more but fewer than all the claims or parties in a case. Second, the district court must expressly determine that there is no just reason to delay appellate review." *EJS Props., LLC v. City of Toledo*, 689 F.3d 535, 537 (6th Cir. 2012). "Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims . . . ." Fed. R. Civ. P. 54(b).

Here, Judge Trauger made neither determination in the order granting partial summary judgment in *Jordan*. Neither the order, (Docket No. 261),[8] nor the accompanying memorandum, (Docket No. 260), expressly directed the entry of final judgment, nor did either determine that there was no just reason for delay. Moreover, Judge Trauger later entered an order and accompanying memorandum amending the prior order and memorandum, (Docket Nos. 277 & 278), in which she expressly characterized the earlier ruling as "interlocutory," (Docket No. 277 at 2–3). Months after that subsequent order was entered, the case settled and no final judgment was entered. *See Arizona v. California*, 530 U.S. 392, 414 (2000) ("[S]ettlements ordinarily occasion no issue preclusion . . . unless it is clear . . . that the parties intend their agreement to

---

[8] All docket numbers in this paragraph refer to entries in *Jordan v. IBP*, No. 3:02-cv-1132 (M.D. Tenn. filed Nov. 21, 2002).

have such an effect.").  Because the employees do not contend that the prior settlement agreement was intended to have preclusive effect, and because the prior proceeding did not result in a final judgment on the merits, the employees cannot invoke issue preclusion with respect to whether donning and doffing the frock begins and ends the continuous workday.

### B.  Compensability of time spent donning and doffing the frock

Under the FLSA, a person employed for a workweek in excess of 40 hours is required to be paid "time and a half" for the time worked beyond the 40-hour threshold.  29 U.S.C. § 207(a)(2).  "Neither 'work' nor 'workweek' is defined in the statute," but in its early cases the Supreme Court "defined those terms broadly."  *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005).  "Work," the Supreme Court has said, is the "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."  *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944); *see also Chao v. Akron Insulation & Supply, Inc.*, 184 F. App'x 508, 510 (6th Cir. 2006) (per curiam) (citing *Tenn. Coal*, 321 U.S. at 598).

In 1947, however, Congress passed the Portal-to-Portal Act ("the Portal Act"), 29 U.S.C. §§ 251–262, to narrow the Supreme Court's capacious definition of compensable "work."  The Portal Act does so by excluding from the FLSA's scope activities that are preliminary or postliminary to principal activities.  Specifically, the Portal Act exempts from the FLSA's coverage

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are either preliminary to or postliminary to said principal activity or activities,

Case 3:09-cv-00125   Document 261   Filed 10/03/13   Page 11 of 43 PageID #: 10065

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a). Also in 1947, the Department of Labor ("DOL") adopted the continuous-workday rule, which defines the "workday" as "'the period between the commencement and completion on the same workday of an employee's principal activity or activities.'" *Alvarez*, 546 U.S. at 29 (quoting 29 C.F.R. § 790.6(b)).

In *Alvarez*, the Supreme Court reaffirmed that "the term principal activity or activities . . . embraces all activities which are an integral and indispensable part of the principal activities." *Id.* at 29–30 (quoting *Steiner v. Mitchell*, 350 U.S. 247, 252–53 (1956)) (internal quotation marks omitted). And it further observed that "any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under § [254(a)] of the Portal-to-Portal Act." *Id.* at 37. As a result, "activities, such as the donning and doffing of specialized protective gear, that are 'performed either before or after the regular work shift, on or off the production line, are compensable under the portal-to-portal provisions of the [FLSA] if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by Section [254(a)(1)].'" *Id.* at 30 (quoting *Steiner*, 350 U.S. at 256).

In *Franklin v. Kellogg Co.*, 619 F.3d 604, 620 (6th Cir. 2010), the Sixth Circuit relied on *Steiner*, *Alvarez*, and precedent from other circuits to articulate three factors to determine whether an activity is integral and indispensable to a principal activity or activities. The court must ask "'(1) whether the activity is required by the employer; (2) whether the activity is necessary for the employee to perform his or her duties; and [(3)] whether the activity primarily benefits the employer.'" *Id.* (quoting *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340,

1344 (11th Cir. 2007)). This test effectively incorporates the judicially created definition of "work," which no longer requires "exertion." *Jordan*, 542 F. Supp. 2d at 803–05 (surveying Supreme Court and appellate caselaw).

Applying these factors, *Franklin* held that because the employer, a food-processing company, primarily benefited from the uniform (which included pants, snap-front shirts, and slip-resistant shoes) and standard equipment (comprised of hair nets, beard nets, safety glasses, earplugs, and "bump caps") that it required employees to don and doff, these activities were "integral and indispensable" to the employees' principal activities. *Id.* at 608, 620. Accordingly, donning and doffing were themselves principal activities that could entitle the employees to payment for activities that occurred after donning and before doffing.[9] *Id.* at 620.

Two years before *Franklin* was decided, in a case brought by another group of Tyson's Goodlettsville employees challenging many of the same compensation practices at issue here, Judge Trauger granted summary judgment to the employees on their claim that the donning and doffing of frocks is compensable under the FLSA. *See Jordan*, 542 F. Supp. 2d at 816. After exhaustively analyzing the caselaw in light of *Alvarez*, *Jordan* held that

> the acts of donning and doffing the frock serve, respectively, as the beginning and the end of the plaintiffs' compensable workday, and all other activities performed in the interim are compensable under the continuous workday rule, while other preliminary and postliminary activities that precede or follow the donning and doffing—such as retrieving, exchanging, and stowing—are not compensable, as they are not integral and indispensable to the plaintiffs' principal activities.

*Id*. at 810.

---

[9] The Sixth Circuit did not decide whether the activities were in fact compensable because it remanded *Franklin* to the district court to consider the employer's affirmative defense that the length of post-donning and pre-doffing activities was de minimis under the statute. *Franklin v. Kellogg Co.*, 619 F.3d 604, 620 (6th Cir. 2010).

13

As in *Jordan*, Plaintiffs here seek summary judgment on their claim that they are entitled to compensation for all of the time worked from "frock to frock," as the acts of donning and doffing the frock begin and end their continuous workday. (Docket No. 206 at 2). The employees lean heavily on *Franklin*, which they insist is controlling, (Docket No. 233 at 3), as well as *Jordan*, which resolved a nearly identical claim as a matter of law in favor of the Goodlettsville employees. Tyson marshals three arguments in its attempt to defeat the employees' motion. First, Tyson claims that whether the challenged activity is "work" is a mixed question of law and fact. (Docket No. 226 at 4–6). Second, it urges that summary judgment is inappropriate because determining whether the challenged activities are "integral and indispensable" to the principal work of beef and pork processing—and particularly the question of whom the challenged activity primarily benefits—is similarly a factual matter. Finally, maintaining that the measure of the continuous workday is the reasonable time the challenged activities take, rather than the actual time they occupy, Tyson argue that the employees have failed to show that their estimated claims are limited to the reasonable time spent on the challenged activities.

The Court begins with Tyson's first argument concerning whether donning and doffing the frock amount to "work." As noted above, the Supreme Court in *Tennessee Coal* defined work as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." 321 U.S. at 598. Tyson does not dispute the exertion element, (Docket No. 226 at 5 n.1), nor does it deny that the frock is required to perform production duties, (*id*. at 6; Docket No. 226-1 at 13). But Tyson resists the conclusion that donning and doffing the frock are "pursued necessarily and primarily for the benefit of the employer and his business." *Tenn.*

14

*Coal*, 321 U.S. at 598. Pointing to a single declaration submitted by a human-resources manager at the Goodlettsville plant, Tyson asserts that the frock benefits the employees because it provides warmth and keeps their street clothes clean. (Docket No. 226 at 6).

While the employees surely receive some benefit from donning and doffing the frocks, the inquiry properly focuses on who "necessarily and primarily" benefits from these activities. As in *Jordan*, there is little doubt here that it is Tyson. Consider the role of frocks in protecting food safety and the detriment Tyson would suffer if their sanitary nature were compromised. Tyson admits, as it must, that requiring the employees to wear frocks benefits the company because it reduces the possibility of contamination in food products. (Docket No. 226-1 at 16). And it further admits that plant rules regarding where frocks may and may not be worn (such as the restroom, cafeteria, and any location outside the plant) work to ensure sanitary standards that enable Tyson to produce a wholesome product for consumers. (*Id*. at 17). Indeed, Tyson concedes that it "could not be run" if every employee worked without a frock on. (*Id*. at 16–17). Weighing cold bodies and dirty street clothes on one side of the scale against Tyson's ability to operate its processing plant on the other, a reasonable jury could not conclude that donning and doffing frocks "necessarily and primarily" benefit the employees. The Court holds that because these activities "necessarily and primarily" redound to Tyson's benefit, they are "work."

Tyson's second argument fares no better. The "integral and indispensable" analysis answers whether the preliminary and postliminary activities that the Court has already determined are "work" are also so "integral and indispensable" to the employees' principal activities that they are not excluded from FLSA coverage by the Portal Act. *See Steiner*, 350 U.S. at 256. As noted, the Sixth Circuit requires lower courts to ask "(1) whether the activity is required by the employer; (2) whether the activity is necessary for the employee to perform his

15

or her duties; and [3] whether the activity primarily benefits the employer." *Franklin*, 619 F.3d at 620 (internal quotation marks omitted). The "[f]actors relevant to whether an activity is integral and indispensable are essentially the same as those relevant to whether an activity qualifies as work." *Jordan*, 542 F. Supp. 2d at 808.

Because Tyson relies on the same facts to support its Portal Act argument as it does its work claim, the Court does not find it necessary to walk through the analysis again. Just as *Jordan* concluded that donning and doffing frocks at the workplace are integral and indispensable to the employees' principal activities—a conclusion Tyson does not dispute, (Docket No. 226-1 at 119)—the Court holds the same here. To tie it together, then, "the acts of donning and doffing the frock serve, respectively, as the beginning and the end of the [employees'] compensable workday, and all other activities performed in the interim are compensable under the continuous workday rule." *Jordan*, 542 F. Supp. 2d at 810.

One final point before the Court moves on to Tyson's third argument. Tyson attempts to manufacture a factual issue by stating that employees wear a variety of standard items, some of which may be donned before the frock or doffed after it. (Docket No. 226 at 6–7). As to time spent donning items *after* the frock at the start of the day (or doffing them before the frock at the end), the continuous-workday rule commands that these increments are compensable. And as to time spent donning items *before* the frock at the start of the day (or doffing them after the frock at the end), Tyson's argument suffers from two flaws. First, Tyson fails in its brief opposing the employees' motion for summary judgment to point to any specific record evidence that supports its contention about the order in which various items are donned and doffed. (*See* Docket No. 226 at 6–7). *See Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008) ("It is not the district court's . . . duty to search through the record to develop a party's

16

claims; the litigant must direct the court to evidence in support of its arguments before the court."). Second, the employees' claims do not embrace the time spent on activities before the frock is donned and after it is doffed; indeed, as the employees put it, they seek compensation only for "time that elapses from 'frock to frock.'" (Docket No. 206 at 2). As a result, Tyson has not set forth specific facts showing that there is a genuine issue of material fact for trial stemming from the "integral and indispensable" nature of donning and doffing a frock at the Goodlettsville plant.

Tyson's last stab at defeating the employees' motion on the issue of "frock to frock" liability is its argument that the employees assert the wrong measure of the continuous workday. (Docket No. 226 at 7–9). Tyson insists that the correct measure is the reasonable time the challenged activities take, rather than the actual time the employees spend on them. Related to this, Tyson takes issue with the employees' reliance on the declarations of several Goodlettsville workers who estimate the amount of time the challenged activities take, contending that these estimates are inherently unsuitable as evidence of the reasonable time those activities require.

As a legal matter, Tyson is simply mistaken. The continuous-workday rule requires employees to be compensated for all time spent during the continuous workday, from the first compensable activity to the last, with the exception of bona fide meal periods and off-duty time. Neither the DOL regulation that articulates the rule, nor the Supreme Court's recent affirmation of it in *Alvarez*, qualifies the rule with a reasonableness standard. *See* 29 C.F.R. 790.6(b) (the term "workday" means "the period between the commencement and completion on the same workday of an employee's principal activity or activities" and "includes *all* time within that period whether or not the employee engages in work throughout all of that period") (emphasis added); *Alvarez*, 546 U.S. at 37 ("during a continuous workday, *any* walking time that occurs

17

after the beginning of the employee's first principal activity and before the end of the employee's last principal activity . . . is covered by the FLSA") (emphasis added).

Moreover, the Sixth Circuit has rejected the reasonableness standard in a related context. *See Brock v. City of Cincinnati*, 236 F.3d 793, 803 (6th Cir. 2001) ("Courts should not inquire into the reasonableness of the amount of work employees actually performed or determine what would have been a reasonable amount of work for an employer to seek and an employee to perform."); *see also Lopez v. Tyson Foods, Inc.*, 690 F.3d 869, 878 (8th Cir. 2012) (noting that some appellate courts have adopted the reasonable-time standard while others, including the Sixth Circuit, have rejected it). Finally, no appellate case decided after *Alvarez* has adopted "reasonableness" as the measure of compensable time within the continuous workday.

Tyson misplaces its reliance on *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946), *superseded by statute on other grounds as stated in Carter v. Panama Canal Co.*, 463 F.2d 1289, 1293 (D.C. Cir. 1972), to support its contention that employees are not entitled to compensation for all the time they spend on activities during the continuous workday. Tyson's selective quotations—such as the Supreme Court's statement that "compensable working time [is] limited to the minimum time necessarily spent in walking at an ordinary rate along the most direct route," *id.*—are irrelevant in light of the Portal Act. In this passage and others Tyson draws on to cobble together its argument, the Court addressed the compensability of time spent walking from the time clock to a work area. The Portal Act, passed less than a year after *Anderson*, invalidated the Supreme Court's interpretation by deeming preliminary—and thus non-compensable—walking time that preceded the employee's first principal activity. *See* 29 U.S.C. 254(a).

Tyson's objection to the employees' reliance on declarations to establish liability is unavailing as well. "The testimony of fairly representative employees may be the basis for an award of back wages to nontestifying employees." *U.S. Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 781 (6th Cir. 1995); *see also O'Brien v. Ed Donnelly Enters.*, Inc. 575 F.3d 567, 585 (6th Cir. 2009) (noting that "it is possible that representative testimony from a subset of plaintiffs could be used to facilitate the presentation of proof of FLSA violations, when such proof would ordinarily be individualized").

Beyond its legal insufficiency, Tyson's claim as to the proper measure of compensable time is premature as a practical matter. The issue the employees have asked the Court to resolve is whether the law requires Tyson to compensate them from "frock to frock." The answer to that question is yes. The extent of the employees' damages, which will ultimately require a determination of the amount of uncompensated work the employees performed, is not yet before the Court. That recovery may be individualized because individual employees may be entitled to compensation for differing amounts of time is irrelevant to determining whether Tyson is liable. In any event, Tyson's objections to the measure of the continuous workday and the evidence the employees have offered to support Tyson's liability do not persuade the Court that a genuine issue of material fact exists for a jury to decide.

Because the Court concludes that the acts of donning and doffing the frock serve as the beginning and the end of the employees' compensable workday, making all other activities performed in the interim compensable under the continuous-workday rule, the employees' motion for summary judgment with respect to this claim will be granted.

## II.  Meal-period claim

Both parties seek summary judgment with respect to the employees' claim that they are denied a "bona fide meal period."  The employees argue that although Tyson's time clocks automatically deduct 30 minutes of time from their pay for each shift they work that is longer than six-and-one-half hours, the employees spend approximately 10–12 minutes during each uncompensated meal period on work activities, including production tasks, doffing and donning their uniforms and gear, waiting, and walking to the meal area.  (Docket No. 206 at 3).  The employees seek compensation for the entire 30-minute meal period or, alternatively, for the actual time they spend working during the unpaid meal break.  (*Id*.).  Tyson counters that the meal period is non-compensable either because it predominantly benefits the employees or because it is off-duty time under 29 C.F.R. § 785.16(a).

The Sixth Circuit articulated the standard for whether a meal period is bona fide, and thus does not have to be compensated, nearly thirty years ago in *Hill v. United States*, 751 F.2d 810 (6th Cir. 1984).  *Hill* held that "[a]s long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties, and does not spend time predominantly for the employer's benefit, the employee is relieved of duty and is not entitled to compensation under the FLSA."  *Id*. at 814.  "The question of whether activities performed during a meal period are predominantly for the benefit of the employer is highly individualized and fact-based."  *Jordan*, 542 F. Supp. 2d at 814 (internal quotation marks omitted).

The meal-period claim cannot be resolved on summary judgment because there are at least three genuine issues of fact as to whether the activities performed during the meal period predominantly benefit the employees or Tyson.  First, the parties dispute the amount of time it

20

takes employees to doff and then again don their frocks and gear at both ends of the meal period. The employees say it takes 10–12 minutes in total; Tyson insists it takes less than one minute at the beginning of the meal period and less than three minutes at the end. (Docket 226-1 at 87–88). While such varying estimates do not create an issue of material fact in the context of the compensability of pre- and post-shift activities, they do in the meal-period context. The Court's conclusion with respect to pre- and post-shift activities is based on two grounds. First, as noted, activities Goodlettsville employees perform between donning and doffing a frock are compensable as a matter of law. Second, Tyson abandoned the defense that the time spent on these activities is noncompensable because it is de minimis. In the meal-period context, however, different time estimates do create a factual question. Depending on how much time employees spend on work activities during the 30-minute meal period, a reasonable jury could conclude, under *Hill*, that this uncompensated time is used "predominantly for the employer's benefit." 751 F.2d at 814. While four minutes out of thirty might not support such a conclusion, twelve minutes spent everyday on Tyson's business reasonably could.

Second, the parties dispute whether the employees regularly perform production work at the beginning of the meal period. The employees claim that although the meal break automatically begins at a certain time each day, at which point they are off the clock, they cannot stop production work until the last piece of meat on the line passes their work station. (*Id.* at 73). They suggest that because it can take up to five minutes for meat to travel from the front of the line to the end, some employees keeping working for several minutes after the meal period begins. (*Id.* at 74). Tyson flatly denies this, insisting instead that each employee's 30-minute meal break begins when he or she leaves the production line. (*Id.* at 73).

21

Finally, the employees argue that they use the restroom during the 30-minute meal period because supervisors discourage them from doing so during paid production time. (*Id.* at 78). As a result, the employees claim that the time they spend using the restroom during their meal periods is compensable. (Docket No. 206 at 24). Tyson counters that employees are allowed to use the restroom during production time and disputes the employees' assertion that supervisors discourage workers from using the restroom as needed. (Docket 226-1 at 78–79).

In resolving these factual disputes, a jury could find that the employees spend time during the meal period "predominantly" for Tyson's benefit, or it could reasonably conclude the opposite. As a result, the Court concludes that the existence of these genuine issues of material fact precludes both parties' motions for summary judgment on the meal-period claim.

## III. Willfulness and good faith

Both parties also seek summary judgment with respect to Tyson's good-faith defense to liquidated damages under 29 U.S.C. § 260, and on the employees' claim that Tyson's alleged FLSA violations were "willful." "Section 6(a) of the Portal-to-Portal Act, 29 U.S.C. § 255(a), provides that if an employer 'willfully' violates the FLSA, the statute of limitations is three years," but only two years if the violation is not willful. *Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 473–74 (6th Cir. 1999); *see also McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988). A plaintiff alleging willfulness must prove "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Richland Shoe*, 486 U.S. at 133. The term "willful" is synonymous with "voluntary," "deliberate," and "intentional," and is "generally understood to refer to conduct that is not merely negligent." *Id.*

22

"The Sixth Circuit has liberally applied the *McLaughlin* standard, repeatedly holding that previous DOL investigations regarding overtime violations are evidence that subsequent FLSA violations are willful." *Byrd v. ABC Prof'l Tree Serv., Inc.*, 832 F. Supp. 2d 917, 920–21 (M.D. Tenn. 2011) (discussing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 964, 967 (6th Cir. 1991), and *Herman*, 183 F.3d at 471).  The Sixth Circuit has made clear that *McLaughlin*'s willfulness standard is met where an employer has actual notice of the FLSA's requirements by virtue of earlier violations, prior agreements to pay unpaid overtime wages, and assurances of future compliance.  *Id.*  The willfulness determination may be made on summary judgment.  *See Herman*, 183 F.3d at 472 (approving the district court's finding of willfulness on summary judgment).

"Closely related to the question of willfulness on the part of the defendants is the issue of liquidated damages." *Dole*, 942 F.2d at 967.  In the words of the statute, an employer who violates the FLSA "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  "Liquidated damages under the FLSA are compensation, not a penalty or punishment."  *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (internal quotation marks omitted).  They are "the norm," *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004), and a "strong presumption [exists] under the statute in favor of doubling," *Elwell*, 276 F.3d at 840 (internal quotation marks omitted).

Courts can only limit or deny liquidated damages if the employer shows that "the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]."  29 U.S.C. § 260; *Elwell*,

276 F.3d at 840. "This burden on the employer is substantial and requires proof that the employer's failure to obey the statute was *both* in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon it more than a compensatory verdict." *Elwell*, 276 F.3d at 840 (internal quotation marks and alterations omitted). "To prove that it acted in good faith, an employer must show that it took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *Martin*, 381 F.3d at 584 (internal quotation marks and alteration omitted). Good faith is more than merely not willfully violating the FLSA. "The employer has an affirmative duty to ascertain and meet the FLSA's requirements, and an employer who negligently [fails to do so] is not acting in good faith." *Id.*

As for the interaction between willfulness and good faith, "a finding of willfulness is dispositive of the liquidated-damages issue," since proof of willfulness precludes a showing of good faith. *Herman*, 183 F.3d at 474. But "the reverse is not necessarily true," as a conclusion that an employer did not act in good faith can still be reached even if an employer's violation was merely negligent and not willful. *Elwell*, 276 F.3d at 842 n.5.

Tyson urges the Court to hold as a matter of law that it acted in good faith and that the employees cannot prove that Tyson willfully violated the FLSA. To support both contentions, Tyson argues that it justifiably relied on the injunction entered in *Reich v. IBP, Inc.*, 1996 WL 137817 (D. Kan. Mar. 21, 1996), which compensates knife-using production employees for certain pre- and post-shift donning-and-doffing activities. (Docket No. 210 at 2). Tyson also recites what it characterizes as the "unsettled" nature of the law on the compensability of the activities at issue here as further proof of its good faith and lack of willfulness. (*Id.*). The employees counter that they are entitled to liquidated damages and a three-year statute-of-limitations period as a matter of law because no reasonable factfinder could conclude that Tyson

24

acted in good faith or without willfulness in light of its "long and sordid history" of noncompliance with the FLSA. (Docket No. 206 at 29–31).

### A. Pre- and post-shift claim

Although the parties do not analyze Tyson's good-faith defense and the employees' allegation of willfulness with respect to each type of alleged FLSA violation, the Court will do so, first considering the pre- and post-shift claim before moving on to the meal-period claim. To begin with the pre- and post-shift claim, the Court concludes that the employees have shown, as a matter of law, that Tyson willfully violated the FLSA. As noted in *Jordan*, Tyson and its predecessor entities have been "litigating this same issue for decades, reflecting what can only be described as a deeply-entrenched resistance to changing their compensation practices to comply with the requirements of FLSA." 542 F. Supp. 2d at 794. Various courts have exhaustively reviewed the twists and turns in this "long history" which all involve "the question of whether [Tyson's] compensation practices violate the [FLSA]," *id*. (citing *Garcia v. Tyson Foods, Inc.*, 474 F. Supp. 2d 1240, 1242–43 (D. Kan. 2007), and *Jordan v. IBP, Inc.*, No. 3:02-cv-1132, 2004 U.S. Dist. LEXIS 30490, at *4–22 (M.D. Tenn. Oct. 13, 2004)), and the Court will not do so again here. For present purposes, it suffices to highlight the following undisputed facts:

- In January 1996, the DOL investigated Tyson's plant in Center, Texas and notified Tyson that "some preliminary activities which are an integral part of the principal activity and which are indispensable to its performance [] are not being compensated." (Docket No. 206-3 at 185). The DOL investigator specified that "the employees' time should begin when they start to put on the hair net, the brown jacket or any other type of garment which is necessary to perform their duties. These types of activities are an integral part of the principal activity and are indispensable to its

performance." (*Id*.). Tyson does not deny that this investigation occurred, nor does it suggest that the DOL failed to explain what was required to comply. Instead, Tyson only notes that it "orally communicated to the investigator its disagreement as a matter of law with his position." (Docket No. 226-1 at 99).

- In February 1998, the DOL issued a fact sheet with findings from the industry-wide poultry-processing investigation the Department's Wage and Hour Division conducted in 1997. The DOL found that many workers "were not being compensated for time spent on work-related tasks, such as: donning required clothing and equipment, disinfecting before going to their work station, and cleaning clothing and equipment." (Docket No. 206-3 at 184).

- In May 2000, the DOL sent Tyson's Executive Vice President notification that the DOL's 2000 poultry-plant initiative revealed "certain systemic problems common to virtually all Tyson Foods's processing plants contacted," including failure to pay employees for all hours worked. (*Id*. at 177–78). Specifically, the letter noted that Tyson gave "[i]nsufficient consideration" to "capturing" time and "paying for certain preparatory and concluding activity," related to "plant workers being required to first obtain/acquire, and then don and doff certain necessary clothing, as well as other work related tasks they perform without being paid." (*Id*.).

- In July 2000, the DOL sent a letter to Tyson's Executive Vice President and Chief Administrative Officer stating that "unpaid time exists" at Tyson plants resulting from time employees spent picking up supplies and equipment; donning or doffing this required gear; walking to work stations after obtaining and donning this gear; walking from and returning to their work stations at meal time. (*Id*. at 181). "Within

26

the plants," the DOL wrote, "these practices . . . are systemic issues our investigations have disclosed." (*Id*.).

- In January 2001, the DOL published an opinion letter that Tyson has had since at least May 2004 that restates the DOL's "longstanding position that . . . compensable hours worked include all time from the moment each employee performs the first principal activity of the employee's workday until the last principal activity is concluded." (*Id*. at 214; *see also* Docket No. 226-1 at 108–09). Specifically, "[a]n employer must compensate its employees for any activity that is an integral and indispensable part of the employee's principal activities, including the putting on, taking off and cleaning of personal protective equipment, clothing or gear that is required by law, by rules of the employer or by the nature of the work." (Docket No. 206-3 at 214). Tyson admits that its pay practices do not "entirely comport" with the DOL's 2001 opinion letter, but insists that it was under no "obligation to follow [the] DOL's nonbinding legal opinion." (Docket No. 226-1 at 109–11). Tyson further admits that it could have complied with the 2001 opinion letter, "but chose not to since it is not legally binding." (*Id*. at 111).

- In May 2002, the DOL sued Tyson alleging that the company failed to compensate poultry-processing employees at its plant in Blountsville, Alabama for time spent donning, doffing, and cleaning equipment. (*Id*.). In November 2009, the jury returned a verdict against Tyson, finding that its employees performed compensable work activities for which they were not compensated. (Docket No. 206-3 at 233). In June 2010, Tyson entered into a consent judgment requiring it to pay all poultry-processing employees for all hours worked from the start of their first principal

27

activity of the workday until the last principal activity of the workday, including any time spent walking and waiting after the first principal activity and before the last principal activity, with the exception of any time taken for any bona fide meal period or bona fide off-duty time.  (Docket No. 226-1 at 112–13).  According to the consent judgment, principal activities include the donning and doffing of protective and sanitary items at the plant, as well as the washing and sanitizing by the employees of themselves and their protective and sanitary gear.  (*Id*. at 113).

- In November 2002, hourly production employees at Tyson's Goodlettsville plant filed a suit in this judicial district alleging that Tyson's failure to compensate employees for time spent donning, doffing, and cleaning equipment, as well as its failure to pay the employees for work performed during their 30-minute uncompensated meal period, violated the FLSA.  (*Id*.).  Tyson admits that even in light of the Supreme Court's 2005 decision in *Alvarez*, which held that employers are required to pay employees from the first principal activity to the last principal activity, Goodlettsville employees are not paid from "frock to frock."  (*Id*. at 117).

- In May 2006, the DOL issued a Wage and Hour Advisory Memorandum interpreting *Alvarez*.  According to the DOL, the Supreme Court "determined that donning and doffing gear is a 'principal activity' . . . and thus time spent in those activities, as well as any walking and waiting time that occurs after the employee engages in his first principal activity and before he finishes his last principal activity, is part of a 'continuous workday' and is compensable under the [FLSA]."  (Docket No. 206-3 at 267 (footnote omitted)).  Tyson admits that Goodlettsville employees are not paid from the time they put on their frocks and, until 2009, were not paid for the time after

28

they clocked out until they doffed their frocks in the locker room. (Docket No. 226-1 at 118).

- In March 2008, Judge Trauger's summary-judgment order in *Jordan* concluded that, under *Alvarez*, donning and doffing the frock at Tyson's Goodlettsville plant are principal activities that "mark the beginning and the end of the continuous workday, such that the plaintiffs are entitled to compensation for those activities and any and all other activities—including any walking, waiting, collecting, sanitizing, and donning of standard or specialized gear—that occurs between those two activities." 542 F. Supp. 2d at 809. Since that decision, Tyson admits that it has failed to pay Goodlettsville employees from the time they put on their frock until they time they take it off. (Docket No. 226-1 at 121–22).

Little controversy, then, surrounds the fact that the DOL has investigated Tyson's pre-shift donning and post-shifting doffing practices and repeatedly told Tyson what it needs to do to comply with the FLSA's requirements. And little doubt remains that Tyson has entered into prior agreements to pay unpaid overtime wages and to assure future compliance. And, finally, it is beyond dispute that despite Judge Trauger's earlier determination that the virtually identical practices challenged here were compensable, Tyson failed to abide the Court's instruction.

Yet Tyson persists in urging that it did not willfully violate the FLSA, hanging on to a single case like a drowning man clutches at driftwood. Ignore the DOL's interpretation of the law, the Supreme Court's decision in *Alvarez*, and Judge Trauger's view of both in *Jordan*; focus instead, Tyson implores, on *Reich v. IBP, Inc.*, a nearly two-decade old, pre-*Alvarez* decision. In *Reich*, a district court held that only knife-wielding production employees are entitled to compensation for pre-shift donning and post-shift doffing activities. 820 F. Supp. 1315, 1325–

29

26 (D. Kan. 1993).  On appeal, the Tenth Circuit affirmed the district court's liability

determination on the grounds that donning and doffing standard gear in a meat-processing plant

"is not work within the meaning of the FLSA" because these activities do not require exertion.

*Reich v. IBP, Inc.*, 38 F.3d 1123, 1125 (10th Cir. 1994).  On that basis, the district court later

entered a permanent injunction requiring IBP to prospectively comply with the FLSA's overtime

and recordkeeping provisions at all of its nonunion plants.  *Reich v. IBP, Inc.*, 1996 WL 445072,

*1–2 (D. Kan. July 30, 1996).

　　In April 1998, in an effort to comply with the injunction, IBP began to pay knife-

wielding employees an additional four minutes a day, which it determined was adequate to cover

compensable activities.  (Docket No. 222-1 at 31).  IBP implemented this compensation scheme

at the Goodlettsville plant in 2001, just months before Tyson bought IBP and the Goodlettsville

plant with it.  (*Id*.).  In the context of this litigation, Tyson insists it has operated in reliance on

the *Reich* injunction with the understanding that the injunction already compensates all

Goodlettsville employees to whom compensation is due.  (*Id*. at 26–27; Docket No. 210 at 2).

　　The problem with Tyson's reliance argument is twofold.  First, it reflects a head-in-the-

sand approach to a changing body of law.  Tyson's defense to the employees' claim of

willfulness is built entirely on the continuing vitality of the Tenth Circuit's compensability

analysis in *Reich*.  As *Jordan* observed, however, "[t]he persuasive effect of the *Reich* decision is

extremely limited . . . as it was issued before the Supreme Court's decision in *Alvarez*, which

clarified that exertion is not required for an activity to be compensable under FLSA."  542 F.

Supp. 2d at 803–04.  Other courts have similarly concluded that *Alvarez* has undermined *Reich*'s

vitality.  *See De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 371–72 (3d Cir. 2007); *Garcia*, 474

F. Supp. 2d at 1246–47.  Having considered those courts' analyses and found no cases affirming

30

*Reich*'s continuing persuasive power with respect to the issue of compensability, the Court concludes that Tyson's reliance on *Reich* against all contrary indications does not rebut the employees' willfulness claim.

Second and related to this, in the face of legal developments, Tyson neither altered its practices at the Goodlettsville plant nor questioned its conformity with the law. Instead, it found grounds to ignore the DOL's repeated and consistent interpretations of the FLSA, and it turned a blind eye to *Jordan*'s analysis of the statute's requirements. The Court might be persuaded that Tyson did not violate the FLSA willfully here if evidence existed that Tyson genuinely sought to reconcile its continuing disagreement with the law. Tyson could have done so, for example, by requesting an opinion letter from the DOL regarding its pay practices in Goodlettsville. Or it could have registered its disagreement with *Jordan*'s liability determination by seeking an appellate ruling of that summary-judgment order at the appropriate time. But Tyson did neither. (Docket No. 226-1 at 125). Instead, it put all its eggs in the *Reich* basket.

As a result, the evidence the employees have marshaled to support their claim that Tyson was on notice that its compensation practices did not comply with the law overwhelmingly shows that Tyson's failure to compensate Goodlettsville employees from "frock to frock" was willful. Tyson does not seriously challenge the fact that it consciously chose not to follow the DOL's interpretation in refusing to pay Goodlettsville employees from "frock to frock." "[A]n employer who knows he may be subject to the Act and proceeds voluntarily to engage in conduct which he knows may violate the Act has done so willfully." *Donovan v. KFC Nat'l Mgmt. Co.*, 682 F.2d 603, 605 (6th Cir. 1982) (internal quotation marks omitted). Moreover, the Court's conclusion with respect to willfulness effectively disposes of the good-faith and liquidated-damages issues. *See Herman*, 183 F.3d at 474 ("a finding of willfulness is dispositive of the

31

liquidated-damages issue"). Therefore, with respect to the pre- and post-shift compensation claim, the Court grants summary judgment to the employees on their willfulness claim and on Tyson's good-faith defense, and denies Tyson's cross-motions on the same.

### B. Meal-period claim

The meal-period claim, however, is a different matter. The Court finds that issues of material fact exist with respect to both Tyson's motion for summary judgment on the issue of good faith and the employees' allegation that Tyson's meal-period practices willfully violated the law.

Starting with the good-faith issue, the Court observes that the employees have produced evidence that could lead a jury to conclude that Tyson did not act in good faith. The DOL's January 2001 opinion letter, which Tyson has had since at least May 2004, (Docket No. 226-1 at 109), for example, notes that "the meal period may not include any time performing 'work,' and that time spent donning and doffing of personal protective equipment, clothing or gear before or after the meal period is compensable," (Docket No. 206-3 at 214). Moreover, Tyson admits that its practice of not compensating employees for the actual amount of time they spend doffing and donning their frocks and other equipment during their uncompensated meal period does not "entirely comport" with the DOL's opinion letter. (Docket No. 226-1 at 110). On that basis, a jury might conclude that ignoring the DOL's position was objectively unreasonable, and thus not done in good faith.

On the other hand, even assuming that the employees performed work that cut into their meal periods as they allege, it is not at all clear that this violated the law. As discussed above, the Sixth Circuit test for whether a meal period is bona fide, and thus noncompensable, is whether the activities performed during that time predominantly benefit the employees. *See Hill*,

751 F.2d at 814. A jury could well conclude that Tyson, in reliance on the Sixth Circuit's malleable standard, reasonably believed that the activities the employees performed during the meal period predominantly benefitted the employees, not Tyson. Without the benefit of further factual development as to how the employees' claims and Tyson's defenses will be submitted to the jury, the Court concludes that the best course is to resolve the good-faith issue regarding alleged meal-period violations at trial.

For similar reasons, the Court concludes that it is inappropriate to resolve on summary judgment the employees' claim that Tyson's meal-period practices represent willful violations of the FLSA. While certain evidence could enable a jury to conclude that the violations were willful—the DOL's 2001 opinion letter and its July 2000 letter to Tyson's Chief Administrative Officer stating the DOL's conclusion that "unpaid time exists" at Tyson plants resulting from "time docked for meal periods where time taken was less than 30-minutes," (Docket No. 206-3 at 181), are two examples—a reasonable jury could just as well conclude that the employees' proof does not meet the bar to show willfulness. At bottom, this is a factual dispute for the jury to resolve. Therefore, the Court denies the parties' cross-motions for summary judgment on Tyson's good-faith defense and the employees' willfulness claim stemming from Tyson's alleged meal-period violations.

## IV. Breach-of-contract claim

Next, both parties seek summary judgment on the employees' breach-of-contract claim. The crux of the claim is that Tyson represents that it pays Goodlettsville employees for "all hours worked," but fails to do so by not paying for all pre- and post-shift and meal-period donning-and-doffing activities. Tyson argues that the employees' various understandings of the phrase "all hours worked" mean that it is insufficiently definite to constitute a term of an enforceable

33

contract.  (Docket No. 210 at 11–12).  Tyson continues that it did not understand the term to embrace all of the time for which the employees seek compensation under the FLSA, intending the phrase to mean only the hours worked according to Tyson's Alternative Time and Attendance system plus the four-minute addition for certain employees that Tyson implemented to comply with the *Reich* injunction.  (*Id.*).  Tyson concludes that because no evidence shows that it ever told Goodlettsville employees it pays on any other basis, the employees' contract claim fails as a matter of law.  (*Id.*).  The employees respond that their various beliefs about how Tyson paid them are irrelevant to determining the existence and terms of the contract between them and Tyson.  (Docket No. 222 at 10).  The employees urge instead that they are entitled to summary judgment because Tyson's failure to pay them for all hours worked breached their employment contracts.  (Docket No. 206-1 at 32–33).

Under Tennessee law, "[t]he essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract."  *ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).  Only the first element is at issue here.  An enforceable contract exists if it "result[s] from a meeting of the minds of the parties in mutual assent to the terms," and is "based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced."  *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (internal quotation marks omitted).  While "[i]ndefiniteness regarding an essential element of a contract may prevent the creation of an enforceable contract," a contract's terms "are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."  *Id.* (internal quotation marks omitted).

An employment agreement is essentially contractual. *Vargo v. Lincoln Brass Works*, 115 S.W.3d 487, 491 (Tenn. Ct. App. 2003). It may be written, oral, or both. *Id.* "Its terms and conditions are supplied from two sources—applicable federal and state law and the agreement of the parties." *Id.* As a result, employees may have "the right and expectation of having work hours consistent with applicable federal and state law." *Goot v. Metro. Gov't of Nashville & Davidson Cnty.*, 2005 WL 3031638, at *8 (Tenn. Ct. App. 2005) (citing *Williams v. Maremont Corp.*, 776 S.W.2d 78, 81 (Tenn. Ct. App. 1988)).

The parties do not dispute that Tyson employs or employed the employees in this case, (Docket No. 226-1 at 2), nor do they dispute that Tyson represents to employees that it pays them for "all hours worked," (Docket No. 210-1 at 9). The problem, by Tyson's lights, is that the parties understand the term "all hours worked" differently, which precludes a meeting of the minds as to this essential element of the contract. The Court, however, sees it otherwise. The parties' subjective interpretations of the term "hours worked" are of no moment in construing the FLSA, related statutes like the Portal Act, and attendant regulations. The FLSA specifies national rules for compensating employees for the hours they work that serve as a statutory floor below which no contract may go. *See, e.g.*, *Singh v. City of New York*, 524 F.3d 361, 372 n.10 (2d Cir. 2008) (Sotomayor, J.) ("the FLSA provides . . . a floor as to when an employer must compensate employees for their time"). And the statute requires that "all hours worked must be compensated." *Chao*, 184 F. App'x at 510. As a result, the judicially construed definition of "hours worked" under the FLSA establishes the minimal meaning of this term, which both parties agree is part of the employees' contracts for employment at the Goodlettsville plant.

This result is consistent with Tennessee law. Tennessee courts, the Court notes again, recognize that applicable federal and state laws, like the FLSA, can be the source of terms in

35

employment contracts. *See Vargo*, 115 S.W.3d at 491. Further still, Tennessee courts will not enforce contractual conditions that are contrary to law, such as an agreement to pay an employee less than the FLSA-defined minimum wage. *See, e.g.*, *Baugh v. Novak*, 340 S.W.3d 372, 385 (Tenn. 2011) ("Tennessee courts have long recognized that, as a general rule, a contract explicitly prohibited by statute is unenforceable."). In this case, the Court has determined that pre-shift donning and post-shift doffing activities in the Goodlettsville plant are compensable as a matter of law under the FLSA and that Tyson's failure to compensate employees for these activities violates federal law. (The compensability of the meal-period activities the employees allege, by contrast, is an open question to be determined at trial.) Tyson's objection to the employees' contract claim founders because it assumes that the compensation practices in Goodlettsville comply with the FLSA. Tyson fails to explain how it can contract with employees on terms that fall below the FLSA's minimal requirements.

Because Tyson's assertion that the phrase "all hours worked" is insufficiently definite to constitute a term in an enforceable contract is unpersuasive, and because Tyson's ancillary arguments related to this claim are similarly without merit, the Court denies Tyson's motion for summary judgment as to the employees' contract claim. Moreover, the Court grants summary judgment on the employees' claim that Tyson's failure to pay them for pre-shift donning and post-shift doffing activities breached their employment contracts. Finally, with respect to whether Tyson's failure to pay the employees for their alleged meal-period activities breached their employment contracts, the Court denies the employees' summary-judgment motion pending resolution at trial as to the compensability of those activities under the FLSA.

36

## V. Tennessee Wage Regulation Act claim

Finally, the employees seek summary judgment on their claim that Tyson violated § 50-2-101(b) of the Tennessee Wage Regulation Act, *see* Tenn. Code Ann. § 50-2-101(b), which, they argue, requires an employer to both inform employees of their wages and pay employees those agreed-upon wages. (Docket No. 206-1 at 33–34). Tyson opposes the employees' motion for summary judgment on this claim. (Docket No. 226 at 32).

Separately, however, Tyson asks for reconsideration of a related order Judge Haynes entered in this case in July 2009 that declined to dismiss the employees' claim under § 50-2-101(b) because Judge Haynes concluded that the statute provided a private right of action. (Docket No. 59). Tyson directs the Court's attention to an amendment to § 50-2-101(b) that the state legislature passed in April 2013 in response to that earlier ruling that Tyson argues has clarified that the state statute does not—and did not at any time—contemplate the filing of civil suits by private parties. (Docket No. 254). Contending that the Court must defer to this legislative clarification, Tyson asks the Court to reconsider the prior ruling and either dismiss this claim outright or deny the employees' motion for summary judgment on it. (Docket No. 255 at 1). In response, the employees argue that while the legislative amendment changed the law prospectively, it did not clarify the statute's historical intent. (Docket No. 256). They maintain that the Tennessee Constitution's ban on retrospective laws prohibits the Court from applying the amended § 50-2-101(b) to dismiss their claim because the private right of action is a substantive right that cannot be eliminated retrospectively.

Federal Rule of Civil Procedure 54(b) provides that any order that adjudicates fewer than all the claims in an action may be revised at any time before the entry of final judgment. *See Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004)

("District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment."). As with a motion to alter or amend a judgment filed under Federal Rule of Civil Procedure 59(e), a court will revise an interlocutory order if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice. *See Arvest Bank v. Byrd*, No. 10-2004, 2011 WL 6179792, at *2 (W.D. Tenn. Dec. 12, 2011).

Whether or not a state statute implies a private right of action is a question of state law. *See Ergon, Inc. v. Amoco Oil Co.*, 966 F. Supp. 577, 583–85 (W.D. Tenn. Mar. 21, 1997) (applying Tennessee law). "The touchstone of the analysis is legislative intent: whether the legislature intended in passing the statute to provide a private right of action." *Id.* at 583. A court must make this determination "without limiting or expanding the statute's coverage beyond what the legislature intended." *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 855 (Tenn. 2010).

Given the text of the statute and the legislative history before Judge Haynes in 2009, the previous order finding that the legislature intended to imply a cause of action in § 50-2-101 was reasonable. After considering the relevant factors[10] and two similar cases, Judge Haynes found that language in the statute expressly rendering it a basis for civil litigation, coupled with the absence of a separate enforcement provision present in other statutory sections, meant that "the

---

[10] These factors are "(1) whether the party bringing the cause of action is an intended beneficiary within the protection of the statute, (2) whether there is any indication of legislative intent, express or implied, to create or deny the private right of action, and (3) whether implying such a remedy is consistent with the underlying purposes of the legislation." *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 855 (Tenn. 2010).

Case 3:09-cv-00125   Document 261   Filed 10/03/13   Page 38 of 43 PageID #: 10092

legislature intended a remedy for workers to complement the [Tennessee Department of Labor's] enforcement authority for other remedies in §§ 50-2-103 and 50-2-104."  (Docket No. 58 at 8).

Subsequently, and while this case was pending, the legislature amended § 50-2-101.  *See* Act of Apr. 23, 2013, 2013 Tenn. Pub. Acts Ch. 240 §§ 1, 2 (amending Tenn. Code Ann. § 50-2-101).  In relevant part, the legislature removed language specifying that the wage amount agreed upon between employer and employee "shall constitute a basis for litigation in civil cases," Tenn. Code Ann. § 50-2-101 (2012), and added language directing that "[t]he department of labor and workforce development shall enforce this section," 2013 Tenn. Pub. Acts Ch. 240 § 2.  (Docket No. 255-1).  In a committee hearing, Representative Haynes, the bill's cosponsor, stated that

> a federal court decision . . . changed the legislative intent of what the legislature originally intended when [it] passed the Wage Regulation Act years ago . . . .  [T]he court said that [it] interpreted that section of the law to give employees a private right of action to sue their employer when there's [sic] wage disputes.  The law has always been, in this state, that . . . the Department of Labor would regulate that.  So, we're just changing that back into compliance with . . . what the original legislative intent was.

(Docket No. 255-2).

The parties' dispute hinges on whether the 2013 amendment clarified the legislative intent behind a law that was ambiguous on its face, or whether the amendment substantively modified a law to remove a private right of action and reassign enforcement to a state agency.  If it's the latter, the employees' contention that the legislature cannot retrospectively interfere with their pending legal claim, a vested right, is correct.  This is because retrospective application of "a remedial or procedural statute [that] impairs a vested right or contractual obligation . . . is constitutionally impermissible."  *Slutsky v. City of Chattanooga*, 34 S.W.3d 467, 469 (Tenn. Ct.

App. 2000). But if it's the former, the employees never had a vested right to begin with, and the legislature is free to apply its remedial amendment retroactively. *See Shell v. State*, 893 S.W.2d 416, 419–20 (Tenn. 1995) (noting that "statutes affecting only the method or the procedure for prosecuting or defending a cause of action may be applied retroactively") (citation omitted).

The legislature's action earlier this year resolves the question under Tennessee law. "To determine whether the legislature intended to create a private right of action . . . , we begin with the express statutory language." *Brown*, 328 S.W.3d at 855. In this case, the pre-amendment version of § 50-2-101 did not expressly provide a private right of action. While it explicitly contemplated civil litigation, the pre-amendment statute did not specify who had the right to bring suit. If, as here, a statute does not expressly create a private right of action, the "next inquiry is whether the legislature otherwise indicated an intention to imply such a right in the statute." *Id.* In 2009, presented with an ambiguous statute and only a modicum of circumstantial evidence as an interpretive guide, Judge Haynes drew a reasonable inference that the legislature intended to provide a private right of action.

But now, with the benefit of additional evidence, the Court concludes that no private right of action was ever intended. "A statutory amendment may be a clarification of original intent, or it may be a modification indicating that the original intent was quite the opposite." *H & R Block E. Tax Servs., Inc. v. State of Tenn., Dep't of Commerce & Ins., Div. of Ins.*, 267 S.W.3d 848, 860 (Tenn. Ct. App. 2008). The Tennessee Supreme Court has given "some interpretive weight to subsequent amendments that purport 'to clarify' the original intentions of the legislative body." *City of Chattanooga v. Davis*, 54 S.W.3d 248, 268 (Tenn. 2001). The state's high court distinguishes between a "mere change in phraseology," which "does not indicate a change in construction of the statute," and a "material change in the phraseology of a statute," which "is

40

generally regarded as a legislative construction that the law so amended did not originally embrace the amended provisions." *Id.* (adopting language from 82 C.J.S. Statutes § 384(b) (1953)). "[T]his is particularly true if [the change] follows soon after controversies have arisen as to the interpretation of the original act, and intervention of judicial decisions may be a material element in determining the effect of an amendment." *Id.* (quoting *State Bd. of Exam'rs for Architects & Eng'rs v. Weinstein*, 638 S.W.2d 406, 409 (Tenn. Ct. App. 1982)).

More recent authorities to address amendments that purport to clarify existing law have articulated factors that "may indicate whether an amendment is clarifying rather than substantive." *Middleton v. City of Chi.*, 578 F.3d 655, 663 (7th Cir. 2009). These include: "whether the enacting body declared that it was clarifying a prior enactment; whether a conflict or ambiguity existed prior to the amendment; and whether the amendment is consistent with a reasonable interpretation of the prior enactment and its legislative history." *Id.* at 663–64 (citing cases from the First and Eleventh Circuits); *see also* 73 Am. Jur. 2d Statutes § 241 (adopting the same test). Other current authorities similarly draw a distinction—which the Tennessee Supreme Court endorsed in *Davis*—between clarifying changes and substantial or radical changes in phraseology:

> A statutory amendment which construes and clarifies a prior statute, rather than changing the law, normally must be accepted as a legislative declaration of the meaning of the original act. A court may find a legislative amendment to be a clarification of a previously existing statute where the legislative history or the language of the statute, as amended, clearly indicates an intent to clarify. When there has been doubt or ambiguity surrounding a statute, an amendment by the legislature may be interpreted as some indication of a legislative intent to clarify, rather than to change, existing law. Likewise, when a legislative amendment is enacted soon after a controversy arises regarding the meaning of an act, it is logical to regard the amendment as a legislative interpretation of the original act.

41

82 C.J.S. Statutes § 460; *see also id.* § 510.[11]

These factors lead the Court to conclude that the 2013 amendment was clarifying in nature. First, the text of H.B. 1223 made relatively minor changes to the statute, removing one sentence and inserting another. The legislative history makes clear that the bill was introduced in response to a "judicial interpretation that changed . . . what the legislature originally intended when [it] passed the Wage Regulation Act years ago." (Docket No. 255-2). The amendment was passed after conflict developed as to the existence of a private right of action under an ambiguous statute. The amendment's language resolved that ambiguity by removing a sentence that had been read to support an implied right of action and inserting a sentence to direct that an executive agency could enforce the substantive right. Further, the amended statute is consistent with a reasonable interpretation of the pre-amendment law. *Cf. Premium Fin. Corp. of Am. v. Crump Ins. Servs. of Memphis, Inc.*, 978 S.W.2d 91, 94 (Tenn. 1998) ("Where an act as a whole provides for governmental enforcement of its provisions, we will not casually engraft means of enforcement of one of those provisions unless such legislative intent is manifestly clear.")

Given that the 2013 amendment clarified the legislative intent behind an ambiguous law without substantively modifying it, the Court concludes that the remedial amendment applies retroactively.[12] *See Kuykendall v. Wheeler*, 890 S.W.2d 785, 787 (Tenn. 1994) (remedial or procedural statutes—those that define "the mode or proceeding by which a legal right is enforced, as distinguished from the law which gives or defines the right"—apply retrospectively

---

[11] This is consistent with the distinction the Tennessee Supreme Court drew in *City of Chattanooga v. Davis*, 54 S.W.3d 248, 268 (Tenn. 2001). A material change in statutory language soon after an interpretive controversy tends to indicate a legislative intent to change the law, whereas a linguistic change soon after such a controversy supports an inference of mere clarification. Of course, that leaves to be determined what constitutes a "material" change.

[12] By contrast, if the legislature had removed language that explicitly granted a private right of action and replaced it with a functionally inferior remedy, the new law could not be applied retroactively. *Shell v. State*, 893 S.W.2d 416, 419–20 (Tenn. 1995). But that is not the case here.

and to pending suits) (internal quotation marks and alteration omitted)).  The employees do not have a vested right to enforce the statute because the statute does not—and never did—include a private right of action.  Judge Haynes's 2009 order inferred a right to sue, evidently contrary to legislative intent; the legislature has now made clear that employees may only file a complaint with the state agency to vindicate the substantive right § 50-2-101 grants.  Accordingly, the Court will dismiss the employees' § 50-2-101(b) claim.  Their summary-judgment motion on this claim is therefore moot.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART the employees' motion for partial summary judgment (Docket No. 206), DENIES Tyson's motion for partial summary judgment (Docket No. 210), and GRANTS Tyson's motion for reconsideration (Docket No. 254).  An appropriate Order will be entered.

_Kevin H. Sharp_

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

43